CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
LUISA TAMEZ (Bar No. 5434469)[1]
(E-Mail: Luisa_Tamez@fd.org)
Deputy Federal Public Defender
3801 University Avenue, Suite 700
Riverside, California  92501
Telephone:  (951) 276-6346
Facsimile:  (951) 276-6368

Attorneys for Defendant
SAMUEL MARTINEZ, III

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　　　v.<br><br>SAMUEL MARTINEZ, III<br><br>　　　　　　Defendant. | Case No. ED CR 21-00067-FLA<br><br>**POSITION REGARDING SENTENCING; EXHIBITS**<br><br>Sentencing Date: November 10, 2022 |

Defendant, Samuel Martinez, III ("Mr. Martinez"), by and through his counsel of record, Deputy Federal Public Defender Luisa Tamez, hereby submits his position regarding sentencing.

　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　CUAUHTEMOC ORTEGA
　　　　　　　　　　　　Federal Public Defender

DATED:  October 27, 2022　　　By　*/s/ Luisa Tamez*
　　　　　　　　　　　　　　　　LUISA TAMEZ
　　　　　　　　　　　　　　　　Deputy Federal Public Defender

---

[1] Luisa Tamez is a government attorney and a member of the New York State Bar. Ms. Tamez has been admitted to practice before the United States District Court for the Central District of California.

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................1

II. THE PRESENTENCE REPORT ..........................................................................1

    A.   The government has not met its burden of establishing that Mr. Martinez is a career offender.................................................................2

    B.   Mr. Martinez is not a career offender because his convictions for Cal. H&S § 11378 are not controlled substance offenses. ...................................3

    C.   Even if Mr. Martinez's convictions are controlled substance offenses, the career offender guideline is not mandatory...........................................6

    D.   Mr. Martinez is facing a greater sentence for intent to distribute 9.9 grams of methamphetamine than he would face for murder. ......................7

    E.   The career offender guideline is not based on empirical evidence and national experience...........................................................................8

III. THE 3553(A) FACTORS SUPPORT A SENTECE OF 5 YEARS ......................10

    A.   Mr. Martinez's history and characteristics................................................10

        1.   Mr. Martinez grew up with instability and began using controlled substances at a young age................................................10

        2.   Mr. Martinez spent the formative years of his young adulthood confined in the barbaric Youth Authority.......................................10

        3.   Mr. Martinez struggled with addiction until he received rehabilitation as part of the instant offense.....................................11

    B.   The nature and circumstances of the offense; the need to reflect the seriousness of the offense; just punishment................................................12

    C.   Providing Mr. Martinez with continued substance abuse treatment will lead to deterrence and protect the public from further crimes...................13

    D.   The methamphetamine guidelines are disproportionately high.................15

IV. CONCLUSION .................................................................................................16

# TABLE OF AUTHORITIES

**CASES**                                                               **PAGE(s)**

*Gall v U.S.*,
    552 U.S. 38 (2007)........................................................................8

*Gonzales v. Duenas-alvarez*,
    519 U.S. 183 (2007).....................................................................4

*Hawkins v U.S.*,
    706 F.3d 820 (7th Cir. 2013) .....................................................6

*Kimbrough v U.S.*,
    552 U.S. 85 (2007)................................................................7, 16

*Lopez-Aguilar v. Barr*,
    948 F.3d 1143 (9th Cir. 2020) ...................................................4

*People v. Becker*,
    183 Cal. App. 4th 1151 (2010) ..............................................5, 6

*Taylor v. United States*,
    495 U.S. 575 (1990).....................................................................4

*U.S. v Booker*,
    543 U.S. 220 (2005)................................................................6, 8

*U.S. v Foote*,
    784 F.3d 931 (4th Cir. 2015) .....................................................6

*U.S. v Gills*,
    592 F.3d 696 (6th Cir. 2009) .....................................................6

*United States v. Carvajal*,
    2005 WL 476125 (S.D.N.Y. Feb 22, 2005) ............................16

*United States v. Flaherty*,
    2018 WL 1417216 (D. Nev. Feb. 2, 2018)................................5

# TABLE OF AUTHORITIES (Cont'd)

*United States v. Hartle*,
2017 WL 2608221 (D. Idaho June 15, 2017) ............................................... 15, 16

*United States v. Hayes*,
948 F.Supp 2d 1009 (N.D. Iowa 2013) ............................................... 15

*United States v. Ibarra-Sandoval*,
265 F. Supp. 3d 1249 (D.N.M. 2017) ............................................... 15

*United States v. Kelly*,
422 F.3d 889 (9th Cir. 2005) ............................................... 3

*United States v. Kovac*,
367 F.3d 1116 (9th Cir. 2004) ............................................... 4

*United States v. Martinez-Lopez*,
864 F.3d 1034 (9th Cir. 2017) ............................................... 4

*United States v. Mitchell*,
238 F. App'x 243 (9th Cir. 2007) ............................................... 2

*United States v. Morales*,
807 F. App'x 654 (9th Cir. 2020) ............................................... 2

*United States v. Nawanna*,
321 F.Supp. 3d 943 (N.D. Iowa 2018) ............................................... 16

*United States v. Rodriguez-Gamboa*,
972 F.3d 1148 (9th Cir. 2020) ............................................... 6

**STATUTES**

18 U.S.C § 3553 ............................................... *passim*

21 U.S.C. § 802 ............................................... 5

21 U.S.C. § 813 ............................................... 5

California Health and Safety Code 11378 ............................................... 2, 3, 4

Cal. Health & Safety Code § 11401 ............................................... 5

U.S.S.G. § 2D1.1 ............................................... 15

U.S.S.G. § 4B1.1 ............................................... 2, 4

iii

# TABLE OF AUTHORITIES (Cont'd)

**STATUTES**

U.S.S.G. § 4B1.2.................................................................2, 3, 4

**OTHER AUTHORITIES**

Michael S. Gelacak, Ilene H. Nagel, & Barry L. Johnson, *Departures Under the Federal Sentencing Guidelines: An Empirical and Jurisprudential Analysis*, 81 Minn. L. Rev. 299, 356-57 (Dec. 1996)................8

Nisha Ajmani, *Failure After Farrell: Violence and Inadequte Mental Health Care in California's Division of Juvenile Justice* .....................11, 12, 13

National Institute of Justice, *Five Things About Deterrence*, (June 5, 2016) available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence.................................................................... 13

U.S.S.C., *Career Offender Guidelines Working Group Memorandum* (Mar. 25, 1988), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/working-group-reports/miscellaneous/031988_Career_Offender.pdf..........................9

U.S.S.C., *Fifteen Years of Guideline Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* (Nov. 2004) available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf .............................................. 8, 9

U.S.S.C., *Report to the Congress: Career Offender Sentencing Enhancements*, at 2 (Aug. 2016), available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/criminal-history/201607_RtC-Career-Offenders.pdf ............................................................ 8, 9

WitnessLA, *Gladiator School: Memories From The Terrible Past of California's Youth Prisons (*October 2020) available at https://witnessla.com/gladiator-school-memories-from-the-terrible-past-of-californias-youth-prisons/ ....................................... 11

Yandiel Muniz, *Designer Drugs and the Federal Analog Act* FIU L.R. (2017) ................................................................5

iv

# I. INTRODUCTION

> If it hadn't been for this case, I wouldn't be clean and sober today. This is the longest I've been out of custody in my whole life since I started getting arrested. This is the longest I've ever been sober. By being in the federal system and having the resources of the federal government, I got into rehab and started going to therapy

*Ex. A*, Samuel Martinez, III Letter ("Ex. A").

Mr. Martinez has struggled with addiction since he was 14 years old. His criminal history and the instant offense are a reflection of his addiction. While on federal pretrial supervision, Mr. Martinez completed the MFI Recovery program. *See Ex. B*. He has been sober for over a year. Mr. Martinez now has stable employment. *Ex. A, C*. He describes the pride he felt at completing a course and passing a test to become a forklift operator, noting he had "never done anything like that before." *Ex. A*. He no longer wakes up consumed with thoughts of drugs, but is able to focus on his family and his work. *Id*. Mr. Martinez is "not seeking mercy," but would like the Court to see how substance abuse treatment has allowed him to completely change his life. *Id*.

Mr. Martinez pleaded guilty to and accepted responsibility for possessing with intent to distribute 9.9 grams of methamphetamine. Presentence Report ("PSR") ¶ 12. For this limited quantity of methamphetamine, he faces a sentencing guideline range of 15 to 19 years of incarceration. This case highlights the disproportionately harsh nature of the career offender guideline and methamphetamine sentencing guidelines. Mr. Martinez's progress while on pretrial supervision is evidence that treatment, not an extensive term of incarceration, is needed to meet the goals of sentencing. Mr. Martinez respectfully requests that the Court impose a five year mandatory minimum sentence.

## II. THE PRESENTENCE REPORT

Mr. Martinez does not object to the United States Probation Office's (the "Probation Office") calculation of a base offense level of 24.  PSR ¶ 22-27. Mr. Martinez

has accepted responsibility for the offense, which would reduce the offense level to 21, with a guideline range of 77 to 96 months.

However, the Probation Office determined that Mr. Martinez is a career offender. Applying a career offender guideline, Mr. Martinez's base offense level automatically increases to 34, with a criminal history category of VI. Because Mr. Martinez accepted responsibility for the offense, the career offender offense level would be 31 with a sentencing guidelines of 188 to 235 months. *Id.* at ¶¶ 28-33; 94.

Mr. Martinez objects to the application of the career offender guideline. His convictions for violating California Health and Safety Code 11378 do not constitute "controlled substance offenses" for the purposes of determining whether he qualifies as a career offender under the sentencing guidelines. Second, even if these prior offenses qualify as controlled substance offenses, the Court has discretion to refuse to apply the career offender guideline. !

Mr. Martinez agrees with the Probation Office that a significant downward variance is appropriate in this case based on his mitigating personal history and characteristics. *See* Dkt. 33. Mr. Martinez respectfully requests that the Court refuse to apply the career offender guideline and sentence him to the mandatory minimum term of five years of incarceration.

## A. The government has not met its burden of establishing that Mr. Martinez is a career offender.

To support a "career offender" enhancement under U.S.S.G. § 4B1.1, the government must establish evidence of at least two prior convictions for either a "crime of violence" or a "controlled substance offense" as defined in U.S.S.G. § 4B1.2. *See United States v. Mitchell*, 238 F. App'x 243, 244 (9th Cir. 2007). Where a sentencing enhancement has an "extremely disproportionate effect," such as increasing an offense level by four or doubling the initial sentencing guideline range, the government must introduce clear and convincing evidence of the prior convictions. *Id.*; *United States v. Morales*, 807 F. App'x 654, 656–58 (9th Cir. 2020).

2

Here, the career offender guideline increases Mr. Martinez's total offense level ten times—from a level 21 to level 31. *See* PSR. His guideline range is also more than doubled from a low end range of 77 months to a low end range of 188 months. The government therefore must introduce clear and convincing evidence that Mr. Martinez has at least two prior convictions for either a "crime of violence" or a "controlled substance offense" as defined in U.S.S.G. § 4B1.2.

The government has failed to meet its burden. It has not provided the Court with any conviction records, but instead relies on the information and conclusions contained in the PSR. *See* Dkt. 40. A PSR "is insufficient to establish the elements of the crime if all it does is recite the facts of the crimes as alleged in the charging papers without indicating whether the information came from a source . . . previously deemed acceptable, such as a signed plea agreement, a transcript of the plea hearing, or a judgment of conviction." *United States v. Kelly*, 422 F.3d 889, 895–96 (9th Cir. 2005) (internal quotations and citations omitted).

The PSR here makes reference to an Abstract of Judgment and felony complaints filed in Mr. Martinez's prior offenses. PSR ¶¶ 40, 43-45. This is insufficient to establish that these prior offenses qualify as a "controlled substance offense."

**B.    Mr. Martinez is not a career offender because his convictions for Cal. H&S § 11378 are not controlled substance offenses.**

Even if the government were to provide evidence of Mr. Martinez's prior convictions, the career offender guideline is not applicable because Mr. Martinez has not been convicted of at least two prior "controlled substance offenses."

A defendant is a career offender if:

> (1) the defendant was at least 18 years old at the time he committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

3

1    U.S.S.G. § 4B1.1(a). The term controlled substance is defined as:

2                an offense under federal or state law, punishable by
3                imprisonment for a term exceeding one year, that prohibits the
             manufacture, import, export, distribution, or dispensing of a
             controlled substance (or a counterfeit substance) or the
4                possession of a controlled substance (or a counterfeit
             substance) with intent to manufacture, import, export,
5                distribute, or dispense.

6    U.S.S.G. § 4B1.2(b).

7            To determine whether a defendant's prior conviction qualifies as a predicate

8    controlled substance offense, courts apply the "categorical approach" and "modified

9    categorical approach" set forth in *Taylor v. United States*, 495 U.S. 575, 599 (1990);

10   *United States v. Kovac*, 367 F.3d 1116, 1119 (9th Cir. 2004). Under this categorical

11   analysis, a court must first look only to the statutory definitions of the corresponding

12   federal and state offenses. *Id.* If a state law prohibits the same amount or less conduct

13   than conduct qualifying as a federal controlled substance offense, then the two offenses

14   are a categorical match. *Id.; See also United States v. Martinez-Lopez*, 864 F.3d 1034,

15   1038 (9th Cir. 2017).

16           Where a state statute prohibits more conduct than the federal statute, a court must

17   determine whether there is "a realistic probability, not a theoretical possibility, that the

18   State would apply its statute to conduct that falls outside the generic definition of a

19   crime." *Lopez-Aguilar v. Barr*, 948 F.3d 1143, 1147 (9th Cir. 2020) (quoting *Gonzales

20   v. Duenas-Alvarez*, 519 U.S. 183 (2007)). There is a "realistic probability" that a state

21   statute exceeds the generic federal definition if it defines a crime more broadly than the

22   generic offense, and the application of the state statute's express text is not a logical

23   impossibility. *Id.*

24           Mr. Martinez's prior convictions for violating California Health and Safety Code

25   section 11378 are overbroad and not controlled substance offenses under the categorical

26   approach. Both California and federal law proscribe analogs of methamphetamine.

27   However, California defines "analog" more broadly than federal law in two critical ways.

28

First, California law does not require that a controlled substance analog be intended for human consumption. Cal. Health & Safety Code § 11401(b). The federal statute, on the other hand, has a blanket requirement that analogs be intended for human consumption in order for them to be treated as controlled substances. 21 U.S.C. § 813(a) ("A controlled substance analogue shall, to the extent intended for human consumption, be treated, for purposes of any Federal law as a controlled substance in schedule I."). This distinction between California analogs and federal analogs is a meaningful one. Certain substances are "often marketed as 'herbal incense,' 'spice,' or 'bath salts' to imply they are not for human consumption and thereby avoid prosecution" under federal law. Yandiel Muniz, *Designer Drugs and the Federal Analog Act*, FIU L.R. (2017). California law omits this "human consumption" requirement and therefore proscribes broader conduct than federal law.

Second, California law requires "analog" controlled substances to have *either* of two qualities for them to be treated as controlled substances, while federal law requires them to have *both*. California defines a methamphetamine analog as "*either*" a substance with a "substantially similar . . . chemical structure" to methamphetamine *or* one "that has, is represented as having, or is intended to have" a "substantially similar" or "greater . . . effect on the central nervous system." Cal. Health & Safety Code § 11401(b) (emphasis added); *see also People v. Becker*, 183 Cal. App. 4th 1151, 1156 (2010).

In contrast, federal law requires that methamphetamine analogs be *both* "substantially similar to the chemical structure" of methamphetamine *and* have an "effect on the central nervous system that is"—or is "represent[ed] or intend[ed]" to be— "substantially similar or greater than" methamphetamine. 21 U.S.C. § 802(32)(A). "Simply put, the [federal] government must prove both chemical similarity and similarity as to pharmacological effect on the human body when consumed." *United States v. Flaherty*, No. 16-CR-0080, 2018 WL 1417216, *3 (D. Nev. Feb. 2, 2018) (collecting cases). While federal law criminalizes only analogs that are *both* similar in

/ / /

5

pharmacological effect *and* similar in chemical structure, California law only criminalizes analogs that meet only one of these two prongs.

California law expressly criminalizes controlled substances as analogs that federal law does not. There is no logical impossibility as to California's prosecution of the broader offense.[2] California actually prosecutes people for methamphetamine analogs, and that it does so without having to prove both substantially similar chemical structure and substantially similar effect. In *Becker*, for example, an expert testified that MDMA "has a stimulant effect substantially similar to the stimulant effect of methamphetamine." 183 Cal. App. 4th at 1156. The Court of Appeal explained that was sufficient evidence that MDMA was "a controlled substance analog of methamphetamine." *Id.*

Mr. Martinez's prior convictions do not categorically constitute controlled substance offenses and the Court cannot apply the career offender guideline in his case

## C.   Even if Mr. Martinez's convictions are controlled substance offenses, the career offender guideline is not mandatory.

The sentencing guidelines are advisory and not mandatory, and though district courts are to take them into account, they are not bound by them. *U.S. v Booker*, 543 U.S. 220 (2005). District courts may not presume that a sentence within the guidelines is reasonable. District courts must make their own independent determination that a guidelines sentence comports with the sentencing standards of 18 U.S.C § 3553(a), even a sentence based on a career offender designation. *See U.S. v Foote*, 784 F.3d 931 (4th Cir. 2015); *See also Hawkins v U.S.*, 706 F.3d 820, 832 (7th Cir. 2013). Given this, district courts are empowered to vary below the low end of the career offender guideline. *See U.S. v Gills*, 592 F.3d 696 (6th Cir. 2009). Rather than a reflexive deference to the

---

[2] The Ninth Circuit's decision in *United States v. Rodriguez-Gamboa*, 972 F.3d 1148 (9th Cir. 2020) is inapposite. Although there the Ninth Circuit stated in a footnote that California's definition of methamphetamine is a categorical match to the federal definition, it did so based on a finding that there was no "realistic possibility" that a person could face criminal liability for the possession of geometric isomers of methamphetamine. *Id.* Through this footnote, the Ninth Circuit did not foreclose any future argument that California's definition of methamphetamine may otherwise be overbroad.

career offender guidelines, the appropriate sentence under 18 U.S.C. § 3553(a) should be sufficient, but not greater than necessary, to achieve the goals of sentencing. *See Kimbrough v U.S.*, 552 U.S. 85, 101 (2007).

**D.     Mr. Martinez is facing a greater sentence for intent to distribute 9.9 grams of methamphetamine than he would face for murder.**

Mr. Martinez has accepted responsibility for, and pleaded guilty to possessing with intent to distribute approximately 9.9 grams of methamphetamine. The career offender guideline range of 188 to 235 months is unduly harsh considering Mr. Martinez's conduct in this case.

To demonstrate the irrationality of the applicable career offender guidelines in this case, one need only compare the guidelines that would apply had Mr. Martinez pled guilty to any number of serious violent felonies that would yield a lower guideline range based on a criminal history category VI after acceptance of responsibility:

| Offense | Guideline | Offense Level | Guideline Range |
|---|---|---|---|
| Voluntary Manslaughter | 2A1.3 | 26 | 120-150 |
| Conspiracy to Commit Murder | 2A1.5 | 30 | 168-210 |
| Attempted Murder | 2A2.1 | 30 | 168-210 |
| Bank Robbery with Use of a Firearm and Bodily Injury to a Victim | 2B3.1 | 27 | 130-162 |
| Carjacking with Brandished Firearm | 2B3.1 | 24 | 100-125 |

7

1    It is unreasonable to suggest that Mr. Martinez is equally as criminally culpable

2  as someone who voluntarily killed another human being. The Court should refuse to

3  apply the career offender guideline as disproportionately harsh and yielding a sentence

4  greater than necessary to achieve § 3553(a)'s purposes.

5  **E.     The career offender guideline is not based on empirical evidence and**

6  **national experience.**

7    The Court should further exercise its discretion and not apply the career offender

8  guidelines in Mr. Martinez's case. The career offender guideline are based on

9  congressional dictate, not the United States Sentencing Commission's (the

10  "Commission") normal process of studying empirical data. *See* U.S.S.C., *Report to the*

11  *Congress: Career Offender Sentencing Enhancements* (Aug. 2016) at 12-14. In other

12  words, the career offender guideline resulted from congressional directive instead of

13  "careful study based on extensive empirical evidence derived from review of thousands

14  of individual sentencing decisions." *Gall v U.S.*, 552 U.S. 38, 46 (2007).

15    The Commission not only failed to rely on empirical evidence, but it also failed to

16  review and revise the career offender guideline in light of judicial decisions, sentencing

17  data, and comments from experts in the field. Indeed, almost ten years before *Booker*, a

18  study of downward departures found "extensive use of [downward] departures from

19  sentences generated by the career offender provisions," and these were "quite

20  substantial," "typically" to the sentence that would have applied absent the career

21  offender provision. *See* Michael S. Gelacak, Ilene H. Nagel, & Barry L. Johnson,

22  *Departures Under the Federal Sentencing Guidelines: An Empirical and Jurisprudential*

23  *Analysis*, 81 Minn. L. Rev. 299, 356-57 (Dec. 1996).

24    The Commission's failure to remedy the problems many courts have identified

25  with the career offender guideline is exacerbated by the Commission itself having

26  recognized that the guideline is flawed. A 1988 Commission study concluded that the

27  career offender guideline "makes no distinction between defendants convicted of the

28

same offenses, either as to the seriousness of their instant offense or their previous convictions . . . even if one defendant was a drug 'kingpin' with serious prior offenses, while the other defendant was a low-level street dealer [with] two prior convictions for distributing small amounts of drugs." U.S.S.C., *Career Offender Guidelines Working Group Memorandum*, at 13 (Mar. 25, 1988).[3] In 1994, the Commission found that the career offender guideline is excessive for deterrence purposes in drug cases, given that low-level drug dealers are easily replaced if the demand remains high. U.S.S.C., *Fifteen Years of Guideline Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform*, at 134 (Nov. 2004).[4] Because of these problems with the career offender guideline, the Commission itself questioned "whether the career offender guideline, ***especially as it applies to repeat drug traffickers***, clearly promotes an important purpose of sentencing." *Id*. (emphasis added).

In 2016, the Commission acknowledged "concerns that the career offender directive fails to meaningfully distinguish among career offenders with different types of criminal records and has resulted in overly severe penalties for some offenders." U.S.S.C., *Report to the Congress: Career Offender Sentencing Enhancements*, at 2 (Aug. 2016).[5] Likely with those concerns in mind, courts are more frequently sentencing career offenders well below the career offender guideline range. "[T]he proportion of career offenders sentenced within the applicable guideline range [ ] decreased from 43.3 percent in fiscal year 2005 to 27.5 percent in fiscal year 2014." *Id.* at 22.

The Court should exercise its discretion to not apply the career offender guideline based on these policy concerns.

---

[3] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/working-group-reports/miscellaneous/031988_Career_Offender.pdf

[4] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf

[5] Available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/criminal-history/201607_RtC-Career-Offenders.pdf.

**III. THE 3553(A) FACTORS SUPPORT A SENTECE OF 5 YEARS**

**A.    Mr. Martinez's history and characteristics.**

   **1.    Mr. Martinez grew up with instability and began using controlled substances at a young age.**

Mr. Martinez was born in 1981, to Frances Martinez and Samuel Martinez, Jr. PSR ¶ 60. Mr. Martinez thought his family was "normal," but recalls seeing his father slap his mom, grab her by the hair, and throw things at her. *Ex. A*. His parents divorced when he was 11 years old and he went to live with his grandparents. *Id;* PSR at ¶ 64. Mr. Martinez lacked supervision at his grandparents' house, and by the age of 12, he had begun using controlled substances. *Ex. A*.

By age 14, Mr. Martinez realized that the peers he was spending most of his time with were gang members. His cousin describes that Mr. Martinez's "life was turned upside down by his parents' divorce and subsequent neglect of love and nurturing parenting that ultimately led him to the life of seeking acceptance in any other outlet. It started with the potheads that lead into harder drugs and ultimately gangs." *Ex. C*. Mr. Martinez notes that "[t]hings started to go downhill from there." *Ex. A*.

   **2.    Mr. Martinez spent the formative years of his young adulthood confined in the barbaric Youth Authority.**

Mr. Martinez sustained his first juvenile conviction at age 17. PSR ¶ 36. From age 17 to 20, Mr. Martinez was confined in the California Youth Authority (the "Youth Authority"). *Id*. Mr. Martinez describes the Youth Authority as "the main turning point in my life. If I could define a moment in my whole life where things went bad, it was going to that place." *Ex. A*. He states:

> I saw a lot of stuff that was completely wrong. I saw sexual assaults, I saw people beaten to death, I saw correctional officers beat. I saw the helicopter landing at least once a week taking people away to the hospital who had been beat or stabbed. This was all at a very young age where it was a shock. I was sentenced to 9 months, but did 4 years because I kept getting in trouble. I preferred to get in fights than to be preyed on. I don't know anybody in the 4 years that I was there that went home on their date. When

10

> I was 18, I did a year in solitary where they would take my bedding, take everything and leave me in my boxers alone in the cell. There was no rehabilitation. There was no resources. I only knew that.

Ex. A.

Indeed, "[d]uring the bad old days of the mid-1990s through to the early 2000s, when California's youth prison system was known as the California Youth Authority . . . the system was plagued by a mind-numbing level of controversy and scandal that included a wave of youth suicides and graphic reports of horrific abuse by staff." *Gladiator School: Memories From The Terrible Past Of California's Youth Prisons* WitnessLA, October 21, 2020.[6] "In 2003, after the media and juvenile justice advocates exposed decades of physical and sexual abuse, dangerous working conditions for staff, capitulation to gangs, and multiple youth suicides, the Prison Law Office (PLO) sued the CYA, which was renamed to the Division of Juvenile Justice (DJJ) in 2005." Nisha Ajmani, *Failure After Farrell: Violence and Inadequte Mental Health Care in California's Division of Juvenile Justice*, Center on Juvenile and Criminal Justice, August 2016.

Mr. Martinez was confined in this system during the peak of its institutional violence and lack of access to mental health care. PSR ¶ 36. He left custody at twenty years old and describes that he was missing a "chunk of my life where I should have learned basic things." *Ex. A.* While in the Youth Authority, Mr. Martinez began using heroin. *Id.* He continued to use heroin all his life "until this case." *Id.*

### 3. Mr. Martinez struggled with addiction until he received rehabilitation as part of the instant offense.

Mr. Martinez has been addicted to heroin since his confinement at the Youth Authority. *Id.* He describes his use of heroin as a coping mechanism, noting that while on heroin, "[n]othing negative mattered . . . It shrouded reality. As I was using, I didn't

---

[6] Available at https://witnessla.com/gladiator-school-memories-from-the-terrible-past-of-californias-youth-prisons/

11

see how it was impacting me. How my family saw me. But I didn't care. I was an addict." *Id.*

Mr. Martinez notes after he was released from the Youth Authority his mind was consumed by drug use and gang activity. *Id.* He describes:

> That time in the Youth Authority programed me to be a certain way. As I got older, anything else was foreign. My mind was not receptive to doing what was right. That wasn't the lifestyle I was living. Because everything else was foreign, I did what I knew, which was drug dealing and going in and out of prison. Every time I got out; my mind was set on making up for lost time. I wanted to have what people my age had. And the only way I felt I could get it was to sell drugs. But obviously I would get arrested and go to prison.

*Id.* Mr. Martinez's adulthood was marred by his addiction and gang involvement. He describes the shame he feels now at having lost custody of his daughter due to his drug use, stating "How could a person not stop doing drugs for their kids?" *Id.* Although he served several prior terms of state incarceration, he did not receive rehabilitative services. *Id.* It was not until the instant offense that he was able to complete a residential treatment program and begin to turn his life around. *Ex. B.*

## B. The nature and circumstances of the offense; the need to reflect the seriousness of the offense; just punishment

The nature and circumstances of this offense weigh in favor of a sentence at the mandatory minimum of five years. Over two years ago, on March 12, 2020, Mr. Martinez possessed with intent to distribute 9.9 grams of methamphetamine. PSR ¶¶ 11-12. Since that arrest, he has obtained sobriety and gainful employment. *Ex. B.*

Although Mr. Martinez's actions were serious, the circumstances of the offense are mitigating. Mr. Martinez pleaded guilty to possessing with intent to distribute a limited amount of controlled substances when compared to the spectrum of federal drug offenses. He did not engage in violent behavior and told law enforcement that he had "slowed down" his sale of controlled substances. PSR ¶ 16.

Mr. Martinez will be more than justly punished by a term of imprisonment of five years. He has obtained sobriety and has seen the life he could have outside of prison. *Ex. A.* Mr. Martinez is punished knowing his one-year-old son will be without his father. *Id.* He has seen the father he could become, and now knows that he will be absent in his son's life. *Id.* He is punished by the knowledge that he is capable of achieving a different, positive life, but will be incarcerated for several years because of his actions. *Id.*

Mr. Martinez timely pled guilty to this offense, accepted responsibility for the offense, and hopes to continue moving forward with his life. A sentence of five years is sufficient, but not greater than necessary to punish him for possessing with intent to distribute 9.9 grams of methamphetamine.

## C. Providing Mr. Martinez with continued substance abuse treatment will lead to deterrence and protect the public from further crimes

As for deterrence, Mr. Martinez's background demonstrates that a severe term of incarceration is not the answer. In Mr. Martinez's "41 years of life he has been in and out of prison for over 20 years." *Ex. B.* Prior prison sentences did not prevent him from reverting to drug use and did not help him cope with the emotional trauma underlying his addiction or gang involvement. In fact, "more severe punishments do not 'chasten' individuals convicted of crimes, and prisons may exacerbate recidivism."[7] Rather, Mr. Martinez was able to change his trajectory after participating in the MFI Recovery Center. *Ex. B.*

Mr. Martinez's counselors at MFI note that Mr. Martinez:

> actively participated in groups and showed the willingness to learn more about behavior changes. Mr. Samuel Martinez consistently processed and shared about his past experiences . . . [he] frequently learned new coping skills which he utilized during his treatment . . . [he] was consistent and responsible in taking the proper actions to learn about addiction and criminal behavior.

---

[7] National Institute of Justice, *Five Things About Deterrence*, June 5, 2016, https://nij.ojp.gov/topics/articles/five-things-about-deterrence

*Ex. B.* Through the program, Mr. Martinez obtained certificates in Stages of Change, Men in Recovery, Grief, Addictive Brain, Addiction Recovery Skills, Seeking Safety, Anger Management, and Healthy Relationships. *Id.*

As a result of his treatment, Mr. Martinez's family has been able to see concrete, remarkable change in him. His uncle, a correctional officer states:

> this time while my nephew has been out I have seen a change in him that I have never witnessed before.  You see in the past I have never known him to hold any type of employment, this time he has been employed and actually talks highly of his employment.  He even helped get one of his friends a job where he works.  In the past I rarely seen him focus on his family. This time not only has he been focusing on his family, but he has been involved and actively spending time with his children.  Bringing them to family gatherings and such.  He has been through a rehabilitation program and has gone through great lengths to remain sober.
>
> I see inmates go to all the programs that are offered from the department of corrections. I see them go through the motions, not because they want to change but because they are required to attend. However I do notice the ones that truly have had enough of the way they been living their lives and truly give an effort to change. That is what I have seen in my nephew Sammy, I see that he is really tired of the way he's been living his life and that he has gone through tremendous lengths to change no matter how hard the struggle is, he truly seems tired of his past life.

His other family members describe that "this is the first time that he's been out long enough to help raise his child" and they can see how he has changed his actions in how attentive he is with his son. *Id.*

Mr. Martinez is keenly aware of how he has changed and firmly plans to maintain his sobriety. *Ex. A.* He states:

> While I've been out, I have therapy every two weeks. I am a happy person right now. I don't have to worry about my life revolving around drugs.  I want to take advantage of RDAP. I know I'm not cured. I don't want to fall into the same patter as every other time I've been custody. Every other time there was no thought of being clean and sober. That's not the case anymore. I have every intention of staying successful.
> *Id.*

14

1    A sentence of five years would be sufficient to punish Mr. Martinez, while also
2    allowing him to continue on his path of recovery. *Id.*

3    **D.    The methamphetamine guidelines are disproportionately high.**

4          A sentence of five years is more than sufficient because methamphetamine
5    offenses are unjustly punished more severely than other drug offenses. Without the career
6    offender enhancement, Mr. Martinez faces a mandatory minimum sentence of five years
7    and a guideline range of 77 to 96 months. However, if Mr. Martinez had possessed a
8    mixture or substance containing a detectable amount of methamphetamine, he would not
9    be subject to a mandatory minimum sentence, and his guideline range would be 27 to 33
10   months incarceration.

11         When the Commission promulgated the current methamphetamine guidelines, it
12   reasoned, in part, that if the drugs were purer, it likely meant the defendant played a more
13   important role in the drug operation. As the Commission stated: "Since controlled
14   substances are often diluted and combined with other substances as they pass down the
15   chain of distribution, the fact that a defendant is in possession of unusually pure narcotics
16   may indicate a prominent role in the criminal enterprise and proximity to the source of
17   the drugs." *United States v. Hayes*, 948 F. Supp. 2d 1009 (N.D. Iowa 2013) (quoting
18   U.S.S.G. § 2D1.1, cmt. n.26(c)) (internal quotation marks omitted).

19         The Commission's reasoning may have made sense at the time, but the
20   Commission's "assumption regarding the connection between methamphetamine purity
21   and criminal role is divorced from reality." *United States v. Ibarra-Sandoval*, 265 F.
22   Supp. 3d 1249, 1252-54 (D.N.M. 2017). As one district court opinion explained, "[d]ue
23   to increases in the average purity of methamphetamine sold today, purity is no longer an
24   accurate indicator of a defendant's culpability or role in a drug enterprise and the
25   presumptive purity assigned to untested drugs does not reflect market realities." *United*
26   *States v. Hartle*, No. 4:16-cv-233-BLW, 2017 WL 2608221, at *1 (D. Idaho June 15,
27   2017). In light of the fact that "most methamphetamine seized at all distribution levels is

28

1  remarkably pure . . . higher purity is not a good indicator of a defendant's place in the
2  chain of distribution." *Id.* at *3.

3      Because drug purity is no longer an accurate indicator of a defendant's role or lack
4  of role in a criminal enterprise, the current methamphetamine guidelines minimize the
5  possibility of individualized sentencing. As another district court opinion explained,
6  "because of the generally very high purity of methamphetamine available today at all
7  levels of the distribution chain, virtually all defendants today face enhanced punishment
8  for a factor present in virtually all methamphetamine cases, not enhanced punishment
9  based on individualized determinations, making the Guidelines purity enhancement
10 excessive." *United States v. Nawanna*, 321 F. Supp. 3d 943, 945 (N.D. Iowa 2018).

11     The Court should take the disparity in the guidelines into account and sentence
12 Mr. Martinez to the mandatory minimum sentence of five years.

13                                 **IV. CONCLUSION**

14     Mr. Martinez fully intends to continue on his path of rehabilitation. He states:
15 "[e]verything has been a first. I know if I could do it this time, I'll be able to do it the
16 second time around." *Ex. A.* A sentence of five years would justly punish Mr. Martinez
17 for the offense, while providing him with needed rehabilitation. A fifteen to nineteen year
18 sentence under the career offender guideline would be disproportionately harsh and yield
19 a sentence greater than necessary to achieve § 3553(a)'s purposes. *Kimbrough v. United*
20 *States*, 552 U.S. 85, 96 (2007).

21     The sentencing goal of rehabilitation "cannot be served if a defendant can look
22 forward to nothing beyond imprisonment. Hope is the necessary condition of
23 humankind . . . A judge should be hesitant before sentencing so severely that he destroys
24 all hope and takes away all possibility of useful life." *United States v. Carvajal*, 2005
25 WL 476125 (S.D.N.Y. Feb 22, 2005) (sentencing a career offender 168 months instead
26 of the 262 career offender guidelines).

27
28

1         Mr. Martinez respectfully requests that the Court sentence him to the five year

2    mandatory minimum term of imprisonment.

3                                Respectfully submitted,

4                                CUAUHTEMOC ORTEGA
                                 Federal Public Defender

5

6    DATED:  October 27, 2022       By  */s/ Luisa Tamez*
                                 LUISA TAMEZ

7                                Deputy Federal Public Defender

17

1

## **PROOF OF SERVICE**

2       I declare that I am a resident or employed in Riverside, County, California; that

3   my business address is the Office of the Federal Public Defender, 3801 University

4   Avenue, Suite 700, Riverside, California 92501; that I am over the age of eighteen

5   years; that I am not a party to the action entitled above; that I am employed by the

6   Federal Public Defender for the Central District of California, who is a member of the

7   Bar of the State of California, and at whose direction I served a copy of the attached

8   **POSITION REGARDING SENTENCING; EXHIBITS** on the following

9   individual(s) by:

10    [ ] Placing      [ ] Placing      [ ] Placing      [X] Via

same in a sealed   same in an envelope   same in a sealed   Emailing same

11  envelope for     for hand delivery   envelope for    addressed as

collection and    addressed as     collection and    follows:

12  interoffice delivery  follows:       mailing via the

addressed as            United States Post

13  follows:                Office addressed as

follows:

14

15  **ABIMBOLA FOWLER**

U.S. Probation Officer

16  Abimbola_fowler@cacp.uscourts.gov

17      This proof of service is executed at Riverside, California, on **October 27, 2022**.

18      I declare under penalty of perjury that the foregoing is true and correct to the best

19  of my knowledge.

20

21             *s/ Isabel Rivera*      .

22             **ISABEL RIVERA**

23

24

25

26

27

28